UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHRISTMAS LUMBER COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:19-CV-55-HBG |
| | ) |
| NWH ROOF & FLOOR TRUSS SYSTEMS, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 14].

Now before the Court is Defendant's Motion to Dismiss the Complaint or, in the Alternative, to Compel Arbitration and Stay Proceedings or, Alternatively, to Transfer Case to Western District of Michigan [Doc. 11]. Plaintiff has responded in opposition, and Defendant has replied. Accordingly, for the reasons more fully explained below, the Court **DENIES** Defendant's Motion [**Doc. 11**].

**I.   BACKGROUND**

The present matter arises out of a contract dispute. [Doc. 1-1 at ¶ 3]. Plaintiff is a lumber company, and as part of its business, it manufactures roof trusses to be installed into structures. [*Id.* at ¶ 4]. Defendant sells, constructs, repairs, upgrades, and installs roof and floor truss production equipment. [*Id.* at ¶ 5]. In October 2017, the parties met at the Building Components Manufacturers Conference, wherein they discussed Plaintiff's need for a more efficient truss

1

production system and Defendant's ability to meet that need. [*Id.* at ¶ 10]. Plaintiff provided Defendant with photographs and drawings of the layout of its truss production system. [*Id.* at ¶ 11]. Later, on December 14, 2017, Defendant provided Plaintiff a preliminary quote of $263,447.00 to fulfill Plaintiff's needs. [*Id.* at ¶ 12]. Several days later, on December 18, 2017, Defendant's representatives visited Plaintiff's truss plant, and Defendant took photographs and measurements of all the equipment. [*Id.* at ¶ 13]. The parties stayed in contact to finalize the necessary specifics to complete the roof truss production system installation. [*Id.* ¶ at 14].

On March 9, 2018, Defendant provided Plaintiff with its final quote that included additional necessary equipment, additional labor services for five days of installation work, and three round trips of freight. [*Id.* at ¶ 15]. On March 26, 2018, Plaintiff signed a purchase order, accepting the order from Defendant and forming the underlying contract. [*Id.* at ¶ 16]. As part of its terms, the contract included refurbishing the eight existing tables that were part of Plaintiff's production line. [*Id.* at ¶ 17]. The installation date was scheduled to begin on June 18, 2018, at Plaintiff's facility. [*Id.* at ¶ 18]. After the parties entered into the contract, but before the installation commenced, Defendant advised Plaintiff that Defendant should completely rebuild Plaintiff's tables, rather than refurbish them as originally purposed. [*Id.* at ¶ 19]. Defendant also concluded that Plaintiff's existing automated channels would properly integrate with the newly constructed tables and other equipment Defendant was providing. [*Id.* at ¶ 20].

Defendant began the installation on June 18, 2018. [*Id.* at ¶ 21]. The Complaint alleges that Plaintiff relied on Defendant's expertise and its representation that it had the knowledge and skill to design, direct, supervise, and implement the desired upgrade to Plaintiff's truss production system contracted by the parties. [*Id.* at ¶ 22]. Plaintiff alleges that during the installation, issues arose with respect to the alignment of the newly constructive tables. [*Id.* at ¶ 23]. The issues with

the alignment of the tables resulted in Plaintiff's existing automated channels not properly fitting within the tables. [*Id.* at ¶ 24]. Defendant's representative Ed Joseph assured Plaintiff the tables were "dead nut." [*Id.* at ¶ 25]. Plaintiff states that the table alignment issues and the inability of the channel to properly fit within the tables led to problems with the compatibility of components and the new equipment such that the system failed to work efficiency and caused damage to Plaintiff's existing equipment and overall business results. [*Id.* at ¶ 26]. The Complaint states that the process of installing the new production system totaled two weeks and that Defendant left the plant with the truss production system not working in an automated and integrated manner as Defendant represented it would after the system was upgraded. [*Id.* at ¶¶ 27-28].

Plaintiff alleges breach of contract, breach of implied warranty for a particular purpose, breach of implied warrant of merchantability, and negligence. [*Id.* at 6-8].

## II. POSITIONS OF THE PARTIES

Defendant argues that the Complaint should be dismissed because Plaintiff agreed to litigate claims arising out of the contract in Michigan and also agreed to arbitration. In the alternative that the Court declines to dismiss the Complaint, Defendant seeks (1) an order compelling arbitration and staying these proceedings, or (2) an order transferring this case to the Western District of Michigan. For grounds, Defendant asserts that Plaintiff signed the contract, which included Schedule B. Schedule B provides that the exclusive venue in any action, including arbitration, is in Lansing, Michigan. Schedule B also provides that the purchaser consents to personal jurisdiction of such courts having jurisdiction over Lansing, Michigan. Further, Defendant asserts that Schedule B also includes an arbitration provision. Finally, if the Court declines to dismiss the Complaint, Defendant argues that Plaintiff's negligence claim is barred by the economic loss doctrine.

Plaintiff filed a Response [Doc. 16], arguing that it never agreed to Schedule B in the contract. Specifically, Plaintiff states that Defendant never furnished it with a copy of Schedule B. Plaintiff states that the contract provides, "Purchaser has read and agreed to the Schedule B contract agreement terms:" [Doc. 16 at 3]. Plaintiff states that the colon at the end of the sentence signals that an additional signature was required. Plaintiff relies on the Affidavit of Theron Tee Cleveland ("Cleveland"), who states as follows:

> Since I had never been provided a copy of Schedule B, I did not sign my name after the colon following this statement concerning Schedule B. The inclusion of the colon indicated clearly to me that the form called for a second signature by Purchaser if Schedule B was a part of the contract. It was my assumption that Schedule B did not apply to the work covered by Exhibit D since [Defendant] had not sent a copy on the three occasions that they sent me a quotation for #17-4851.

[*Id.* at 4]. Plaintiff states that it received Schedule B on June 28, 2018, but it accompanied a different quote for equipment and had nothing to do with the quote that Plaintiff signed three months earlier that is the subject of this suit. Thus, Plaintiff denies that Schedule B is part of the contract. Further, Plaintiff argues that the economic loss doctrine does not apply to this case, and therefore, Plaintiff's negligence claim is proper.

Defendant filed a Reply [Doc. 17], maintaining that Schedule B is part of the contract. Defendant argues that it is irrelevant that Plaintiff did not receive a copy of Schedule B. Further, Defendant argues that Plaintiff's hyper technical reading of the contract is not reasonable and that the colon at the end of the statement that Plaintiff "read and agreed" to Schedule B does not free Defendant of the consequence of that representation. Finally, Defendant argues that evaluation of its Motion to Dismiss with respect to the negligence claim must be based on allegations pled in the Complaint and that the Court should not consider the factual allegations Plaintiff has now asserted.

## III.     STANDARD OF REVIEW

Defendant cites both Federal Rules of Civil Procedure 12(b)(1) and (b)(6) in its Motion. Pursuant to Rule 12(b)(1), a claim for relief may be dismissed if the court lacks subject matter jurisdiction. "A plaintiff bears the burden of proving jurisdiction and a court is empowered to resolve factual disputes when subject matter jurisdiction is challenged." *Zundel v. Mukasey*, No. 3:03-cv-105- 2009 WL 3785093, at *3 (E.D. Tenn. Nov. 10, 2009) (citing *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 224 (6th Cir. 2007)) (other citations omitted). A challenge of jurisdiction may be made through a facial attack or a factual attack. *Gentek Bld. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 326 (6th Cir. 1990)). A facial attack challenges the sufficiency of the pleading, and a court must take the allegations in the complaint as true. *Id.* "On the other hand, where there is a factual attack, the Court must weigh the conflicting evidence provided by the plaintiff and the defendant to determinate whether subject matter jurisdiction exists." *U.S. v. Chattanooga-Hamilton County Hosp. Authority*, 958 F. Supp. 2d 846, 854 (E.D. Tenn. 2013) (citing *Gentek*, 491 F.3d at 330). The Court may consider evidence, including but not limited to, "affidavits, documents, an even a limited evidentiary hearing to resolve jurisdictional facts." *Id.* (citing *Gentek*, 491 F.3d at 330).  "The party asserting that subject matter jurisdiction exists has the burden of proof." *Id.* (citing *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007)).

A motion to dismiss pursuant to Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff and to assume the veracity of well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.,* 484 F.3d 855, 859 (6th Cir. 2007). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986).

## IV. ANALYSIS

The Court has considered the parties' positions as outlined above, and for the reasons more fully explained below, the Court finds Defendant's Motion not well taken, [**Doc. 11**] and it is **DENIED**.

The Court will first address whether this case should be litigated in this forum and then turn to Defendant's argument regarding Plaintiff's negligence claim.

### A. Forum

As an initial matter, there does not appear to be any factual disputes between the parties. *See also* [Doc. 17 at 10] (Defendant's Reply) ("Here, there are no disputes of fact between the parties . . ."). The primary dispute is simply whether Schedule B is part of the contract. If it is, then this case is subject to arbitration and/or litigation in Michigan. Specifically, Schedule B contains the following provisions:

> This Contract shall be governed by and construed in accordance with the laws of the state of Michigan. The Seller and Purchaser agree that this Contract is made in Lansing, Michigan. The Seller and Purchaser agree that this Contract is made in Lansing, Michigan and they further agree that exclusive venue in any action (including arbitration) arising out of the Contract shall be proper only in Lasing, Michigan. Purchaser consents to the personal jurisdiction of such courts having jurisdiction over Lansing, Michigan.
>
> Any controversy between the Seller and Purchaser shall be settled by arbitration in Lansing, Michigan. Any arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association and in accordance with Michigan's Revised Uniform Arbitration Act. A court of competent jurisdiction may render judgment based on the arbitrator's decision.

[Doc. 11 at 2-3; Doc. 16-1 at 16].[1]

In the present matter, the contract, bearing the number 17-4851, (hereinafter, "Contract") was signed by Plaintiff on March 26, 2018.[2] The Contract states, "Order Accepted by Purchaser:" and it contains Cleveland's signature following the colon. [Doc. 16-1 at 12]. The Contract also requests the "date:" wherein Cleveland wrote, "3/26/17." [*Id.*]. Under Cleveland's signature, the Contract contains the following sentence: "Purchaser has read and agreed to the Schedule B contract agreement terms:" Cleveland did not sign his name after the above sentence, explaining as follows:

> Since I had never been provided a copy of Schedule B, I did not sign my name after the colon following this statement concerning B. The inclusion of the colon indicated clearly to me that the form called for a second signature by Purchaser if Schedule B was part of the contract. It was my assumption that Schedule B did not apply to the work covered by Exhibit D [Doc. 16-1 at 12] since [Defendant] has not sent a copy of the three occasions that they sent me quotations for #17-4851.

[Doc. 16-1 at 2-3].

Defendant does not dispute that prior to Plaintiff signing the Contract, it never provided Plaintiff with a copy of Schedule B. Defendant believed that Plaintiff had Schedule B, and Plaintiff

---

[1] Defendant states that Schedule B is attached to the Declaration of Edward Joseph. [Doc. 11-1]. There are no attachments to Joseph's Declaration; however, there does not appear to be a dispute about the contents of Schedule B. Further, Plaintiff included Schedule B as an exhibit [Doc. 16-1 at 16], and the language therein is verbatim to the language that Defendant includes in its brief. [Doc. 11 at 2-3]. In addition, Plaintiff states that the Court should not review Schedule B because the Complaint does not refer to Schedule B, and therefore, "[a]bsent the provisions of Schedule B, there is no basis upon which to grant the relief requested by Defendant." [Doc. 16 at 12]. Plaintiff, however, submitted Schedule B in its filings. Further, as mentioned above, the Court is permitted, and must, review Schedule B to determine whether there is a valid arbitration or forum selection clause.

[2] As Plaintiff points out, the date on the Contract actually states, "3/26/17," [Doc. 16-1 at 12], but the parties do not dispute that the correct date is March 26, 2018, and that 2017 is simply an error.

did not indicate otherwise. Defendant argues that it provided a copy of Schedule B in an email to Plaintiff on June 28, 2018, and during that time, Defendant was still in the process of performing under the Contract. Plaintiff states that when it received Schedule B on June 28, 2018, it was part of a different quote for different work, which Plaintiff did not agree to or accept.

The parties agree that "a contract must result from a meeting of the minds of the parties in mutual assent to the terms." *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 383 (6th Cir. 2005) (citing *Higgins v. Oil, Chemical and Atomic Workers Int'l Union, Local No. 3–677,* 811 S.W.2d 875, 879 (Tenn. 1991)); *see also Kloian v. Domino's Pizza, L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006) (explaining that under Michigan law, a contract is formed upon an offer and acceptance and a mutual assent or meeting of the minds on all essential terms). "[M]utual assent is gathered from the language of the contract rather than the unexpressed or undisclosed intentions of the parties." *Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3CV, 2007 WL 1153121, at *4 (Tenn. Ct. App. Apr. 19, 2007); *Kloian*, 733 N.W.2d at 771 (explaining that the meeting of the minds is "judge by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind") (quotations omitted). The parties also agree, "It is a bedrock principle of contract law that an individual who signs a contract is presumed to have read the contract and is bound by its contents." *84 Lumber Co. v. Smith,* 356 S.W.3d 380, 383 (Tenn. 2011); *Lease Acceptance Corp. v. Adams*, 724 N.W.2d 724, 732 (Mich. Ct. App. 2006) ("[T]he law is clear that one who signs an agreement, in the absence of coercion, mistake, or fraud, is presumed to know the nature of the document and to understand its contents, even if he or she has not read the agreement.").

Further, "writings referred to in a written contract are incorporated by reference into the contract and must be considered as part of the agreement of the parties." *Lasco Inc. v. Inman*

8

*Constr. Corp.,* 467 S.W.3d 467, 473 (Tenn. Ct. App. 2015); *In re Estate of Koch*, 912 N.W.2d 205, 214 (Mich. Ct. App. 2017) ("When a contract incorporates a writing by reference, it becomes part of the contract, and courts must construe the two documents as a whole.").

Here, the Court finds that there was no meeting of the minds that Schedule B was part of the Contract. Specifically, Cleveland signed that he accepted the order, but directly below his signature, the Contract states, "Purchaser has read and agreed to the Schedule B contract agreement terms:" The colon at the end of the sentence signals that something else follows (i.e., a signature).[3]

Moreover, the parties do not dispute that Plaintiff did not receive Schedule B at the time the Contract was signed. Plaintiff explains that its representative did not place his signature after the phrase, "Purchaser has read and agreed to the Schedule B contract agreement terms:" because he did not receive Schedule B and believed that it did not pertain to the Contract he was signing. The fact that Plaintiff did not receive or read Schedule B is not dispositive, but coupled with the phrase and punctation in the Contract, such leads the Court to conclude that Plaintiff's belief is a reasonable interpretation of the Contract.

The cases that Defendant relies on do not convince this Court otherwise. For instance, in *Logan & Kanawha Coal Co., v. LLC v. Detherage Coal Sales*, *LLC*, 514 F. App'x 365 (4th Cir. 2013), the Court held that the parties' contract incorporated an arbitration clause by reference. *Id.* at 366. There, plaintiff faxed a purchased order to defendant, and the fax cover sheet stated in handwriting that the fax consisted of two pages and included with the cover sheet a one-page purchase order, which stated, "ALL TERMS & CONDITIONS ON THE FOLLOWING PAGES ARE INTO [sic] AND MADE PART OF THIS CONTRACT." *Id.* The plaintiff, however, did

---

[3] *See* Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/colon (last visited March 10, 2020) (defining "colon" as a punctuation mark used chiefly to direct attention to matter (such as a list, explanation, quotation, or amplification) *that follows*") (Emphasis added).

9

not include the "following pages" to the fax. *Id.* The defendant signed the purchase order and never informed plaintiff that it had not received the terms and conditions referenced in the purchase order. *Id.* The defendant, however, had previously received the arbitration clause in relation to prior contracts it had with the plaintiff. *Id.* Following a dispute, plaintiff filed an arbitration demand. *Id.* at 367.

The Court held that there was a valid arbitration provision, which was incorporated by reference. *Id.* at 369. The Court explained as follows:

> Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship. *Standard Bent Glass Corp. v. Glassrobots Oy,* 333 F.3d 440, 447 (3d Cir.2003); *see also* 11 Williston on Contracts § 30:25 (4th ed.2011). Although it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms, Williston on Contracts § 30:25, the party challenging incorporation need not have actually received the incorporated terms in order to be bound by them, especially when both parties are sophisticated business entities. *See Standard Bent Glass,* 333 F.3d at 447 n. 10.

*Logan*, 514 F. App'x at 367–68. The Court continued that merchants must exercise a higher level of diligence and that "where the parties are familiar with the secondary document at issue due to an ongoing business relationship or course of dealing, incorporation may be easier." *Id.* at 368 (citation omitted). The Court noted that the contract made a clear reference to a second document: "the terms and conditions on the following pages." *Id.* at 369. The Court also reasoned that the identity of the secondary document was sufficiently ascertainable and that "parties' course of dealings allays any concern that incorporation will result in surprise or hardship to [defendant]." *Id.*

Here, however, the Contract does not mention any "following pages," and there is no evidence that the parties previously engaged in business prior to signing the Contract. Further,

there is no clear reference that the Contract incorporates Schedule B as part of the parties' agreement. As the undersigned mentioned above, it appears that the phrase, "Purchaser has read and agreed to the schedule B contract agreement terms:" requires a separate signature as opposed to incorporating a separate document into the Contract.

Defendant also cites to *Standard Bent Glass v. Glassrobots Oy*, 333 F.3d 440 (3d. Cir. 2003), wherein the Court also found that the arbitration provision was incorporated by reference. The Court explained as follows:

> The seller's terms may include documents or provisions incorporated by reference into the main agreement. Traditional documents incorporated by reference into contracts include accepted industry guidelines or parallel agreements between the parties. Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship

*Id.* at 447. The Court found that the arbitration agreement was incorporated into the contract because the contract contained references to an appendix, which included the arbitration agreement, as well as an explicit reference to arbitration as the method of dispute resolution; the cover letter to the agreement referred to the enclosure of certain appendices, and the contract provided that if the parties could not agree to a completion date, "the matter shall be submitted to arbitration as set out later in this agreement." *Id.* Further, other provisions in the contract referenced the appendix containing the arbitration agreement. *Id.*

Unlike the contract in *Standard Bent Glass*, the instant Contract does not refer to additional appendixes, pages, or an arbitration provision. Instead, on its face, Schedule B appears to be a separate agreement requiring a separate signature. *Compare Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3CV, 2007 WL 1153121, at *3 (Tenn. Ct. App. Apr. 19,

11

2007) (finding arbitration appropriate when the contract expressly adopted by reference the "general conditions of the contract for construction," which contained the arbitration clause).

Defendant argues that requiring Plaintiff's signature because there is a colon after the phrase, "Purchaser has read and agreed to the Schedule B contract agreement terms:" is a hyper technical reading of the Contract. Defendant also asserts that the word "date" is not included beside the phrase but is included beside Plaintiff's signature. Defendant argues that the absence of another "date" establishes that a signature is not necessary. While the Court has considered such an interpretation, the Court ultimately disagrees. The Court finds that the colon after the phrase, the fact that Plaintiff did not receive Schedule B at the time the Contract was signed, there is no indication of the contents of Schedule B in the Contract, and Schedule B is not explicitly incorporated into the Contract, establishes that Schedule B is not part of the Contract.

### B.     Negligence

Defendant argues that Plaintiff's negligence claim should be dismissed because the economic loss doctrine bars such a claim under Michigan and Tennessee law. Defendant states that Plaintiff's negligence claim asserts that it incurred economic loss (in the form of decreased value of the purportedly non-functioning equipment and lost profits from the alleged decreased value in productivity) and that such economic loss was the result of Defendant's alleged negligence in performance of its contractual duties. Defendant states that Plaintiff must instead seek recovery under theories of contract and remedies made available to it under the Uniform Commercial Code. Defendant asserts that the fact that it rendered some services in the form of supervision of installation under the Contract with Plaintiff does not remove the action from the scope of what is essentially a claim for the alleged defective and/or non-conforming goods.

Plaintiff denies that the economic loss doctrine applies in this case. Plaintiff states that it has a claim for damage to its property that it already owned. In addition, Plaintiff further argues that it has alleged that Defendant's negligent rendition of serves in designing, supervising, and implementing the installation of the new components were useless and the existing system had to be substantially rebuilt. Plaintiff states that the economic loss doctrine does not apply to contracts for services. Plaintiff cites to the Complaint and Cleveland's Affidavit in support of its argument.

Defendant argues that the evaluation of the negligence claim must be based on the allegations in the Complaint and not based on Cleveland's Affidavit. Defendant maintains that based on the allegations of the Complaint, the negligence claim against Plaintiff falls within the scope of the economic loss doctrine and should be dismissed. Defendant states that even if the Court considers the Affidavit, dismissal of the negligence claim is still appropriate because the alleged loss of function, incomparability, and damage to the other component parts is not damage to other property as that term has been defined and applied in the context of the economic loss doctrine. Finally, Defendant argues that the Tennessee Court of Appeals has applied the economic loss doctrine in the context of service contracts.

As an initial matter, the Court agrees with Defendant that on a motion to dismiss pursuant to Rule 12(b)(6), it is not proper to consider matters outside the pleadings. Therefore, the Court declines to review Cleveland's Affidavit as to this argument. Further, the Court notes in its Motion, Defendant, in a footnote, argues that Michigan law should apply. Defendant also states, however, "These same principals and understanding of the economic loss doctrine apply under Tennessee law." [Doc. 11 at 19]. Defendant then proceeds to rely on Tennessee law. In its Response, Plaintiff relies on Tennessee law. "In a diversity action, the district court must apply the choice-of-law rules of the state in which it sits." *CPC Int'l, Inc. v. Aerojet-Gen. Corp.,* 825 F.

Supp. 795, 802 (W.D. Mich. 1993) (other citations omitted). Because the parties have not briefed this issue, but they both cite to Tennessee law, the Court will follow suit.[4]

"The economic loss doctrine is 'a judicially created principle that reflects an attempt to maintain separation between contract law and tort law by barring recovery in tort for purely economic loss.'" *Am.'s Collectibles Network, Inc. v. Sterling Commerce (Am.), Inc.*, No. 3:09-CV-143, 2011 WL 2118574, at *3 (E.D. Tenn. May 26, 2011) (quoting *Ham v. Swift Transp. Co., Inc.,* 694 F.Supp.2d 915, 921 (W.D. Tenn. 2010)) (other quotations omitted). Specifically, the "doctrine provides that '[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.'" *Id.* (quoting *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.,* 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001)), *abrogated on other grounds, Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016).

Plaintiff makes two arguments in support of its negligence claim. First, Plaintiff argues that it has alleged in its Complaint that Defendant damaged other property. *See* [Doc. 1-1 at ¶ 26] (The table alignment issues and the inability of the channel to properly fit within the tables led to problems with the compatibility of components and the new equipment Plaintiff purchased from Defendant such that the system failed to work efficiently and caused damage to existing equipment and to Plaintiff's overall business results). Second, Plaintiff argues that the Contract was also one for services and that the economic doctrine does not apply to service contracts.

---

[4] The Court notes, "Tennessee generally follows the traditional *lex loci contractus* rule, *i.e.,* the construction and validity of a contract are governed by the law of the place where the contract was made, absent a contrary intent." *Dryair 2000, Inc. v. Blue Winged Olive, L.L.C.,* No. 1:07-CV-22, 2009 WL 311132, at *5 (E.D. Tenn. Feb. 6, 2009). "However, where questions relating to performance of the contract are raised, the law of the state of performance is sometimes applied." *Id.*

With respect to the latter argument, the undersigned notes that the Court has previously "agree[d] that the economic loss rule is applicable to the sale of goods but does not extend equally to contracts for the provision of services. Therefore, the rule is inapplicable to the instant case, which concerns a contract for services." *Tan v. Wilbur Smith Assocs., Inc.*, No. 2:09-CV-25, 2011 WL 3421320, at *7 (E.D. Tenn. Aug. 4, 2011). As this Court has also explained, "At the pleading stage, a determination cannot be made whether the transaction between the parties herein had as its predominant purpose the provision of services, as alleged by plaintiff, or the sale of goods as alleged by defendant. The record must be further developed and argued before such determination can be made." *Am.'s Collectibles Network, Inc.,* 2011 WL 2118574, at *5. The Court agrees with the above approach and will allow Defendant leave to file an appropriate motion once the record is further developed.

Plaintiff also argues that Defendant damaged its existing property. Both parties cite to the Tennessee Court of Appeals decision in *Messer Grieshelm Industries, Inc. v. Cyrotech of Kingsport, Inc.*, 131 S.W.3d 457 (Tenn. Ct. App. 2003). In *Messer*, the Tennessee court analyzed the economic loss doctrine and whether plaintiff could recover damages for property. The court described the difference of property damage versus economic damage as follows:

> [W]e use the terms "property damage" on the one hand and "economic loss" on the other to describe different kinds of damage a plaintiff may suffer. An action brought to recover damages for inadequate value, costs of repair, and replacement of defective goods or consequent loss of profits is one for "economic loss." Property damage, on the other hand, is the *Restatement's* physical harm ... to [user's] property.

*Id.* at 465 (quoting White & Summers, Uniform Commercial Code, § 11-4 (2d Ed. 1980) (other quotations omitted).

The court further relied on a United States Supreme Court case, summarizing as follows:

> In *Saratoga,* another admiralty case, the plaintiff's fishing vessel sank as a result of an engine room fire caused by a defective hydraulic system installed by the defendant boat manufacturer. The original purchaser of the vessel had added a skiff, a seine net and miscellaneous spare parts and these were all incorporated into the vessel when it was resold to the plaintiff and were destroyed when it sank. The Supreme Court noted that under its prior holding in *East River,* [476 U.S. 858 (1986)], although a plaintiff cannot recover in tort for physical damage a defective product causes to itself, a plaintiff can recover for physical damage the defective product causes to other property. The issue in *Saratoga* was whether the added equipment-the skiff, seine net, etc.-was part of the "product itself" or "other property" for which the plaintiff could recover. The Court found that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself' " and "equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is not part of the product that itself caused physical harm. Rather, in *East River's* language, it is 'other property'."

*Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.,* 131 S.W.3d 457, 464 (Tenn. Ct. App. 2003) (citing *Saratoga Fishing Co., v. J.M. Martinac & Co.*, 520 U.S. 875 (1997)).

In the instant matter, the Complaint alleges that the new equipment that Defendant installed caused damage to the existing equipment. [Doc. 1-1 at ¶ 26]. Accordingly, given that the Court must construe the Complaint in the light most favorable to Plaintiff, the Court declines, at this time, to dismiss the negligence claim.

## V.   CONCLUSION

Accordingly, for the reasons explained above, the Court finds Defendant's Motion to Dismiss the Complaint or, in the Alternative to Compel Arbitration to Stay Proceedings, or Alternatively, to Transfer Case to Western District of Michigan [**Doc. 11**] is **DENIED.**

**IT IS SO ORDERED.**

ENTER:

_____
United States Magistrate Judge